## The Burd Orphan Asylum *versus* The School District of Upper Darby.

Testatrix by her will provided for the establishment of an asylum, whose object should be the maintenance and education of white female orphan children, of not less than four years or more than eight: first, who shall have been baptised in the Protestant Episcopal Church, in the city of Philadelphia; second, the same class of children baptised in said church, in the state of Pennsylvania; third, all other white female orphan children, between the said years, without respect to any other description or qualification whatever; and in every case, the orphan children of clergymen of the Protestant Episcopal Church shall have the preference. The will contained further directions, that the form of worship and instruction should be that observed and taught in the Episcopal Church, and appointed the bishop of said church and his successors the perpetual visitor. *Held*, that the asylum is a "purely public charity," within the meaning of section 1, article 9 of the constitution, which provides, that the legislature may exempt from taxation institutions of purely public charity, and that said institution was within the letter of the Act of May 14th 1874, and therefore exempt from taxation.

March 24th 1879. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, WOODWARD, TRUNKEY and STERRETT, JJ.

Error to the Court of Common Pleas of *Delaware county*: Of January Term 1877, No. 50.

[Burd Orphan Asylum *v.* School District.]

Case stated, wherein the School District of Upper Darby was plaintiff, and the Rector, Church-wardens and Vestrymen of St. Stephen's Church in the City of Philadelphia, Trustees of the Burd Orphan Asylum of St. Stephen's Church, were defendants.

The case as stated was as follows:

Eliza Howard Burd, deceased, late of the county of Philadelphia, by her last will and codicils thereto, proved April 11th 1860, devised and bequeathed, inter alia, to the defendants, who are a corporation, a large amount of property in trust "to establish an asylum for poor white female orphans," to be called "The Burd Orphan Asylum of St. Stephen's Church." The will thus declares the object of the asylum:

"The objects of the said asylum shall be to maintain, educate, and at a suitable age and time (to be judged of and determined by those to whose management I have intrusted the asylum), to place out to be instructed in proper employments—First, the white female orphan children of legitimate birth, of the age of not less than four years, and of not more than eight years, who shall have been baptised in the Protestant Episcopal Church in the city of Philadelphia. Secondly, the same class of children baptised in the said church in the state of Pennsylvania; and thirdly, all other white female orphan children, of legitimate birth, not less than four years of age, and of not more than eight years, without respect to any other description or qualification whatever, except that at all times, and in every case, the orphan children of clergymen of the Protestant Episcopal church shall have the preference." * * *

"I desire, and do hereby direct, that in the building erected for the asylum, there shall be an apartment prepared and set apart as a chapel, to be kept sacred for the worship of Almighty God, Father, Son and Holy Ghost, in conformity with the rites and ceremonies of the Protestant Episcopal Church. And I do hereby positively direct and enjoin that all the children received into the asylum, shall be faithfully instructed, as part of their education, in the principles of the precious gospel of my God and Saviour Jesus Christ, as they are held and taught by the Protestant Episcopal Church in the United States, and that no other system of religion shall be taught there; and moreover, that all the worship held therein shall be according to the ritual of said church, and no other." * * *

"The rector, church-wardens and vestrymen of St. Stephen's Church are hereby authorized to control and manage the said Burd Orphan Asylum according to their best judgment and discretion, and to adopt regulations for the government of the same, provided their proceedings shall not be in conflict with the laws of the Commonwealth of Pennsylvania, with the principles and canons of the Protestant Episcopal Church, or with the directions herein given and the objects herein specified; and the Right Reverend the

[Burd Orphan Asylum *v.* School District.]

Bishop, for the time being, of the Protestant Episcopal Church of the diocese in which the city of Philadelphia may be, is authorized to. be and constituted a perpetual visitor of said institution, with full power to inquire, as such, into all abuses and violations of this trust, and, whenever deemed necessary by him, to interfere by legal proceedings for their correction."

The defendants, upon the receipt of the property thus devised and bequeathed them, purchased a piece of land in Delaware county aforesaid, containing something less than forty-five acres, and erected thereon a building for an orphan asylum, which building was first occupied in September 1863.

Since that time the asylum has been open continuously for the reception of white female orphan children, according to the provisions of the will, who have been received without regard as to their residence as to either state or county. These children are maintained and educated at the asylum until they arrive at the age of eighteen years. The whole number of children that have been received and enjoyed the benefits of the asylum is one hundred and twenty, sixty of whom are at the present time being maintained and educated at the asylum.

Connected with the asylum is a church or chapel, capable of seating four hundred persons, in which divine service is held twice a day every Sunday, according to the rites and ceremonies of the Protestant Episcopal Church, the said services being conducted by a duly ordained minister of that church; and these services are, by direction of the trustees, free to all, and attended by many of the neighbors as their parish church.

With the exception of the chapel, so used as aforesaid, the land and buildings of the asylum are devoted exclusively and entirely to the maintenance and education of the orphan children received into the asylum, in accordance with the provisions of the will. A copy of said will is hereto annexed and made part hereof.

The defendants are a corporation, incorporated May 21st 1823, under the Act of Assembly of April 6th 1791, in such case made and provided, by the title of "The Rector, Church-wardens and Vestrymen of St. Stephen's Church in the City of Philadelphia."

There have been levied upon the real and personal property of the defendants, as trustees aforesaid, according to the adjusted valuation thereof furnished by the commissioners of Delaware county, as per schedule hereto annexed, for school purposes, taxes for the years 1874, 1875 and 1876, amounting in the aggregate to $232.13, the amount for each year being stated in said annexed schedule. These taxes were levied by the plaintiff in June of each year, for the said three years respectively, and are admitted to be correct apportionments of the said taxes on the amount of real and personal property belonging to the defendants, but which the said defendants

[Burd Orphan Asylum *v.* School District.]

object to paying on the ground that the said property is exempt from taxation under the laws of the Commonwealth.

If the court shall be of opinion that the real and personal property of the defendants, used as aforesaid, is thus taxable for the benefit of the school directors of Upper Darby, then judgment to be entered for the plaintiffs for the sum of $232.13, or for such part thereof as the court shall determine the said property is taxable for, according to the schedule annexed. If the court shall be of opinion that the said property is not thus taxable at all, judgment to be entered for the defendants. Costs to follow the judgment, and either party reserving the right to sue out a writ of error.

The court, Clayton, P. J., delivered the following opinion:

" The defendants are the trustees of a charitable institution, founded by Eliza Howard Burd. They claim that, under the constitution and laws of Pennsylvania, their property is exempt from the payment of school tax. The ninth article of the constitution of Pennsylvania declares that all taxes shall be uniform upon the same class of subjects, but that the legislature may, by general laws, exempt 'institutions of purely public charity,' and that all laws exempting other than the property enumerated therein shall be void. Under this power in the constitution, the legislature, by general law, Act of May 14th 1874, P. L. 158, exempted from taxation 'all hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, *benevolence, or charity, founded, endowed and maintained by public or private charity.*'

" In order to ascertain the true sense of this enactment, it must be construed in conformity with the foregoing clause of the constitution, and must therefore be read as though the words 'purely public' were inserted after the words ' benevolence or charity.' To read the act in any other way would be clearly unconstitutional. All that the constitution requires is, that the *object* of the institution shall be a *purely* public charity. It may be founded, endowed and maintained by private charity; that is to say, by private benevolence, good-will, liberality and alms-giving. Most public charities are so endowed: 2 Kent 274. The only question, therefore, to be now decided is, whether the institution of which the defendants are the trustees is a '*purely* public charity;' if it is, then the plaintiffs admit it to be exempt from taxation, but if not, the judgment must be for the plaintiffs upon the case stated.

" The cases cited by the plaintiffs' counsel do not apply with the force he contends for. They mostly relate to the distinction between public and private corporations; but it is quite clear that a charitable corporation may be strictly a private one, yet the charities it dispenses may be purely public. The question in this case is not, whether the Burd Orphan Asylum of St. Stephen's Church is a public or private corporation, but whether the charity the cor-

poration dispenses is of a *purely* public nature.    This .depends upon the extensiveness of the objects of the institution.    A college or a hospital founded by a public benefactor, which extends its benefits to the people of any municipal division of the public, no matter how small its territorial limits may be, is a public charity ; thus a hospital for the use of the people of a particular parish, though a private corporation, is nevertheless a public charity.    Every charity which is extensive in its object may, in a certain sense, be called a public charity: Attorney-General *v.* Pearce, 2 Atk. 88.

" A charity need not be universal in order to be a public one. It may be for the poor, the blind, for widows, or for orphans of a parish or township, or of a city, county, state or government.    Our constitution requires that the charity shall not only be of a public nature, but *purely* of a public one.    A charity, therefore, restricted to a particular religious denomination, or to persons baptised in a certain faith, is not a *purely* public charity, no matter how extensive its object may be among the persons of the religious faith to whom it is restricted.    When the people of Pennsylvania adopted the present constitution, they saw proper to restrict the charities, which were to be exempt from taxation, to *purely* public ones.    As before stated, they did not mean those only which might be founded or endowed by the public, but they required that the *objects* should be public, and they inserted the adverb *purely* before the word *public* for some purpose.    We have no authority to strike it out.    The word in its ordinary meaning signifies: without any mixture of that which is foreign ; without connection with, or dependence upon, anything else ; absolutely, entirely.    If the charity depends upon a religious test, or is restricted to a particular sect, or if the preference is to be given to persons baptised in a certain faith, in such a manner as probably to absorb the entire benefit of the founder's bounty, it is not a *purely* public charity.·  By applying these principles to the institution in question, we can easily ascertain whether it is such a *purely* public charity as is contemplated by the constitution and Act of Assembly, as above cited.

"The institution known by the name of the 'Burd Orphan Asylum of St. Stephen's Church' is a private corporation.    Mrs. Burd, by her will, proved April 11th .1860, devised to the corporation a large amount of property in trust to establish the institution.    The object of the institution, as declared by its charter, is to educate and, at a suitable age and time, to place out to be instructed in proper employments :

" 1.  The white female orphan children of legitimate birth, of the age of not less than four years and not more than eight years, who shall have been baptised in the Protestant Episcopal Church, in the city of Philadelphia.

" 2.  The same class of children baptised in the said church, in the state of Pennsylvania, and

"3. All other white female orphan children of legitimate birth, not less than four years of age and not more than eight years, without respect to any other description or qualification whatever, except that at all times, and in any case, the orphan children of clergymen of the Protestant Episcopal Church shall have the preference.

"The institution is to be presided over by the Bishop of the Protestant Episcopal Church of the Diocese of Pennsylvania, and a chapel is to be maintained therein for religious worship, according to the Protestant Episcopal faith.

"Can this institution, in any proper sense, be called a *purely* public charity? Upon a cursory view, the third class of persons entitled to the benefits of this charity would appear to be the general public, being white female orphans, of the age named; but, upon a careful reading, even this apparent public benefit is postponed to the *daughters* of Protestant Episcopal clergymen throughout the world. It is to be taken for granted that the institution is limited in its capacity. It would most likely be filled by orphans who have been baptised in the Protestant Episcopal Church in the city of Philadelphia. If any room remains the orphans, so baptised, throughout the whole state of Pennsylvania, are to be next provided for, and if there is still accommodation for more, then the daughters of Episcopal clergymen throughout the world are to be received before the children of the general public of the city of Philadelphia, or any other place, can enter it. The exclusion, therefore, of the general public is so great as to amount to almost absolute rejection. Perhaps the object of the word *purely*, in the constitution, was to meet just such delusive public charities as this.

"While, therefore, the institution is highly beneficial to the public, and its object very commendable, it is clearly not a *purely* public charity, and not included within the Act of Assembly exempting its property from taxation for school purposes. Judgment is therefore ordered for the plaintiff, on the case stated, for $232.13."

The defendants took this writ, and assigned this order for error.

*Ludovic C. Cleemann*, for plaintiffs in error.—A private corporation may be denominated a public charity. "Public," in this connection, cannot mean "universal," and it is not at all inconsistent with the idea conveyed by the word "public," that it should mean one class of many into which the public is divided. Thus a blind asylum is only for the blind in the community; a deaf and dumb asylum, for the deaf and dumb only; a hospital, for the sick and injured; a sailor's "snug harbor," for sailors only: Attorney-General *v.* Pearce, 2 Atk. 87; Ommanney *v.* Butcher, Turn. & Russ. 260; Dartmouth College *v.* Woodward, 4 Wheat. 670.

It is not inconsistent with the idea of a public charity that it

[Burd Orphan Asylum *v.* School District.]

should be confined to the poor of a particular township: County of Lawrence *v.* Leonard et al., 2 Norris 206. A public charity is one where those who are to take are strangers to the donor or testator: Philadelphia *v.* Fox, 14 P. F. Smith 170; Allen *v.* McKean, 1 Sumn. 296. This institution does not exclude the public. There certainly could be no more general and comprehensive description of a class than the third, for which provision is made, viz.: orphan children, between certain ages, without respect to any other description or qualification whatever. The direction to take from the other classes, is only where the number applying is too great and simply furnishes a means of selection. Such has been the practical construction placed upon it by the trustees, and there are now children within the asylum from all parts of the state. If among those applying there are orphans of clergymen of the Protestant Episcopal Church, they are to be preferred; but if none of these apply, there is no preferment or exclusion. There are no cases cited by the defendant in error in which a preference was not given to a portion of the public to the exclusion of the rest: as hospitals for the blind, institution for the poor of a certain district, &c.

This case falls directly within the definition of a " purely public charity," as given in the case of Donohugh *v.* The Library Co., 5 Norris 306. The court was of opinion in that case that the word "purely" was used to exclude charitable institutions, apparently public, but in which there was mixed up some private gain. Here the property of the asylum is devoted exclusively and entirely to the maintenance of orphan children.

The public character of this institution cannot be taken away because a peculiar faith is taught therein. Such a consideration cannot influence the determination of this question: Magill *v.* Brown, Brightly 346; sect. 3 of Constitution; Warde *v.* Manchester, 56 N. H. 508; Price *v.* Maxwell, 4 Casey 28; Foreign Missionary Society's Appeal, 6 Id. 425; McGirr *v.* Aaron, 1 P. & W. 49; Beatty *v.* Kurtz, 2 Pet. 580.

*A. Lewis Smith,* for defendant in error.—Admission to this institution is qualified and governed by a religious test, and the question for decision is whether such an institution is, or can be "a purely public charity." The essential feature of a public use is that it is not confined to privileged individuals, but is open to the indefinite public. It is this indefinite or unrestricted quality that gives to it its public character: Donohugh *v.* Library Co., *supra;* Philadelphia *v.* Fox, 14 P. F. Smith 169; Babb *v.* Reed, 5 Rawle 151.

The constitution forbids any preference or appropriation to any denominational or sectarian institution. Yet the distinguishing feature of this charity is the sectarian character engrafted upon it by its donor. It is pointedly exclusive in its requirements as to

religious connection. It is delusive to rest upon the third qualification for admission as showing the public character of the institution. The most exclusive religious establishment conceivable could be made a public charity if that kind of interpretation is to govern. The donor has only to place the public so far off that they will never be reached, and his gift will be secured from taxation all the same as if exclusively public. No court could graduate the scale or determine the limit.

In the Donohugh Case, the word "purely" was construed to mean "completely, entirely, unqualifiedly." Are we at liberty to give this most emphatic word a qualified or secondary meaning, and especially one not in harmony with the other parts of the constitution? It is said that it was inserted to exclude institutions administered for private gain. But these are not "public charities" at all, and the word "purely" in that connection becomes useless. It is conceded that a private institution may be a public charity, but it cannot be a purely public charity unless it can be administered as the state herself would administer it, were she the trustee or founder of it.

Mr. Justice TRUNKEY delivered the opinion of the court, May 5th 1879.

The clear and convincing opinion of the learned judge of the Common Pleas comprises all that need be said in support of the judgment. He puts the case on the true ground, namely, that the charity is not purely public, for the reason that it is practically limited to white female orphan children, who shall have been baptised in the Protestant Episcopal Church. His reasoning upon the essential point, accords with the doctrine of Donohugh's Appeal, 5 Norris 306, where it was held that private institutions for purposes of purely public charity, and not administered for private gain, may be exempted from taxation. It was there said, "The essential feature of a public use is that it is not confined to privileged individuals, but is open to the indefinite public. It is this *indefinite* or unrestricted quality that gives it its public character. The smallest street in the smallest village is a public highway of the Commonwealth, and none the less so because a vast majority of the citizens will certainly never derive any benefit from its use. It is enough that they may do so if they choose. So there is no charity conceivable which will not, in its practical operation, exclude a large part of mankind, and there are few which do not do so in express terms, or by the restrictive force of the description of the persons for whose benefit they are intended. Thus, Girard College excludes by a single word, half the public, by requiring that only *male* children shall be received; the great Pennsylvania Hospital closes its gates to all but *recent* injuries, yet no one questions that they are public charities in the widest and most exacting

sense. * * * Next, and last, we have to consider the force to be given to the word 'purely' in the constitutional phrase, 'purely public charity.' In this connection, and in its ordinary sense, the word purely means completely, entirely, unqualifiedly, and this is the meaning we. must presume the people to have intended in adopting it in their constitution." Per Mitchell, J., in C. P.

From the foregoing, it is at once seen that a public use, whether for all men or a class, is one not confined to privileged persons. The smallest street is public, for all have an equal right to travel on it; but a way used by thousands, which may be shut against a stranger, is private. Would Girard College be a public charity if the male children entitled to admission were limited to sons of deceased Masons or Odd Fellows? If Pennsylvania Hospital closed its gates to all but Methodists or Baptists, having recent injuries, the people would not believe it a purely public charity in the intendment of their constitution. A charity for the poor of a parish or township is public; but not, if confined to poor Presbyterians in the municipality.

Public charities may be restricted to a class of the people of the state or of a municipal division; at the same time, they must be general for all of the class, within the particular municipality. "Thus, a blind asylum is only for the blind in the community." If it be completely public, all the blind in that community are on an equal footing, and should its capacity be insufficient for all, there is no mistaking justice in the order of admission. To open its doors only to the blind of a particular religious denomination, or of a beneficial association, or of a political party, shuts them against the public. A known and recognised class, though not generally poor, or diseased or decrepit, may be the subject of a public charity, as sailors; yet if the endowment were limited in its benefits to sailors who are members of a designated sect, there could hardly be two opinions of its character.

Private or individual gain in a pecuniary sense, is not the sole test. "The true test is to be found in the objects of the institution." Where these are to advance the interest of a party, of an association, of a private corporation, of a religious denomination, and the like, however beneficial to the public their growth and success may be, there is a private object to gain; the institution is not unqualifiedly public. In such cases the purpose is wholly private, or the private blends with the public.

The constitution prohibits appropriations "to any denominational or sectarian institution, corporation or association;" and of money raised for public schools, to be "used for the support of any sectarian school." It forbids exemption from taxation of all property, except such as may be devoted to public purposes and uses. Among the public purposes, "actual places of religious worship" are named, thereby excluding from the exception other property held by reli-

gious societies. How can it be said that an institution for the support and education of the orphan children of a distinct denomination of Christians, may be exempted from taxation within the spirit of the constitution? Judgment affirmed.

Chief Justice SHARSWOOD and Justices MERCUR and PAXSON, dissented.

On May 20th 1879, "The Church Home for Children," united in an application for a re-argument of the case and through its counsel, George Tucker Bispham, Esq., assigned the following reasons therefor:

It is a charity incorporated by the laws of this Commonwealth, whose constitution authorizes it to maintain and educate orphans and desitute white children, to be received without regard to the religious belief of their parents, but to be trained in the faith of the Protestant Episcopal Church of the United States. By an Act of the Legislature, passed in 1860, its real estate, which is in the county of Philadelphia, has been exempted from taxation. It had believed that, by reason of being "an institution of charity," it came within the provisions of the Act of the 14th of May 1874, and was, therefore, still exempt from taxation. And such has been the view heretofore adopted by the proper authorities.

The petitioner does not believe that its claim for exemption from taxation rests entirely on the same basis as that of the Burd Orphan Asylum, and it is advised that the decision of the court recently made will not necessarily affect it. Certainly it will not be conclusive as to its rights. It unites, however, in the petition for a re-argument, as it believes that, upon careful reconsideration, the Burd Orphan Asylum will be considered as exempt from taxation, and *a fortiori*, that the property held by the petitioner will be exempt.

Its view of the questions involved is, in brief, as follows:

1. It involves the constitutionality of the Act of 14th of May 1874, under which the corporation in question was expressly exempted as "an institution of benevolence or charity," and the act, though not referred to in the opinion, is in effect decided to be unconstitutional.

In five states similar constitutions have been identically interpreted by their various legislatures, and the constitutionality expressly sustained by the court. It is submitted that this question is too important to be determined without the fullest presentation and investigation.

2. It is conceived that no logical distinction can exist between classification by creed and classification by race, age, color, sex, birth, or physical or mental disabilities.

3. The constitutional provisions that the legislature shall not

[Burd Orphan Asylum *v.* School District.]

appropriate money to any sectarian institution, was not intended to apply to laws exempting such institutions from taxation; for,

(*a*) Otherwise the constitution would be inconsistent with itself, as it expressly authorizes exemption laws as to "actual places of religious worship," which are necessarily and invariably sectarian, and burial-grounds, which are usually so.

(*b*) Classification by creed has always existed in tax-exemption laws, not only as to churches, but as to charities, such as hospitals, schools, &c.

(*c*) And for this obvious reason: The religious sympathies of men towards charity can be reached in cases where more abstract philanthropy would fail to touch them, and it is both the duty and the policy of the state to take advantage of that fact in aid of the public duty, and in case of state appropriation.

4. In other states there have been decisions which, under similar constitutions and statutes, expressly recognise the validity of such classification by creed as exists in the case at bar.

The Supreme Court ordered a re-argument, which was made before the court on the 25th of March 1880; there being on the bench SHARSWOOD, C. J., and MERCUR, GORDON, TRUNKEY, STERRETT and GREEN, JJ. (The latter was appointed by the governor to succeed Hon. WARREN J. WOODWARD, who died in September 1879.)

In the statement of facts by the plaintiff in error at the re-argument, after a review of the three qualifications for admission to the asylum, it was said:

"Religious belief being, therefore, a mere question of education, and not of admission; in other words, the question being not one of exclusion, but of preference, the trustees have always received such children of the required age and sex as have applied; and have never acted upon the directions of the will in regard to preferred classes, being advised that those directions only applied when there were more applicants than could be received."

"The assumption of the learned court below, and upon which the cause was ruled, that 'the exclusion of the general public is so great as to amount to almost absolute rejection,' was not warranted by anything appearing of record, and, as matter of fact, the contrary is true. In case of a vacancy at the asylum, any destitute white female child of the prescribed age could ask the aid of the court to admit her, unless there were other preferred applicants then demanding admission."

*Ludovic C. Cleemann* and *William Henry Rawle*, for plaintiff in error.—The Burd Orphan Asylum is a charity, and none the less so because it benefits a particular religious denomination: Domestic Society's Appeal, 6 Casey 425; Price *v.* Maxwell, 4 Id. 23; Wit-

man *v.* Lex, 17 S. & R. 88; Mayer *v.* Society, 2 Brewster 386; Evangelical Association's Appeal, 11 Casey 316; Beatty *v.* Kurtz, 2 Peters 566; Trustees *v.* Beatty, 28 N. J. Eq. 570; Goodell *v.* Union Association, 29 Id. 33; De Camp *v.* Dobbins, 31 Id. 670; Convention *v.* Portland, 65 Maine 92; Vidal *v.* Girard, 2 Howard 199; McGirr *v.* Aaron, 1 P. & W. 49; Magill *v.* Brown, Brightly's Rep. 346; Perry on Trusts 701, 702, 733, 734.

The asylum is a public charity, not being established for private ends, and being open to the indefinite public of the specified class.

An error sometimes arises (and to the layman it is often insurmountable) from the use of the words "the public." The law says the charity must be "indefinite," and yet every one knows that there can be no charity wide enough to include all classes within it, and hence the law, while wholly excluding, as not within the class of charity, mere beneficial associations, suffers almost all kinds of discrimination and exclusion within the class of charity.

This asylum is a public charity administered by a private corporation: Allen *v.* McKeen, 1 Sumner 296; Dartmouth College *v.* Woodward, 4 Wheat. 670; Philadelphia *v.* Fox, 14 P. F. Smith 170; Attorney-General *v.* Pearce, 2 Atk. 87; Humphries *v.* Little Sisters, 29 Ohio 206; McDonald *v.* Massachusetts Hospital, 120 Mass. 432; City *v.* Indianapolis Home, 50 Ind. 215; Clement *v.* Hyde, 50 Vt. 716; Warde *v.* Manchester, 56 N. H. 508; Wright *v.* Linn, 9 Barr 438. As it is neither founded nor conducted for either individual or corporate profit, it is a purely public charity: Donohugh *v.* Library Co., 5 Norris 306; Gerke *v.* Purcell, 25 Ohio 229; City *v.* Indianapolis Home, *supra;* McDonald *v.* Hospital, *supra.*

It is submitted that the constitutional provision *was* intended to exclude—1. Charities not public, as a gift to the donor's "poor relations:" Attorney-General *v.* Bucknall, 2 Atk. 328. 2. Charities founded with a view to profit. 3. Charities which, though free from private profit, were for organizations not in themselves legal charities, as Masonic orders, dramatic associations, beneficial societies, &c.: Swift *v.* Easton Society, 23 P. F. Smith 362. 4. Institutions connected with public charities, but not used for the purposes of charity, as parsonages, real estate producing rental, &c.: Mullen *v.* Commissioners, 4 Norris 289; Christian Association *v.* Donohugh, 7 W. N. C. 208; New Orleans *v.* St. Patrick Association, 28 La. Ann. 512. But it was *not* intended to exclude public educational charities, neither founded nor conducted for profit, and in actual use for the purposes of their organization. It was not intended to apply to an exemption which treats all sects alike.

We contend, therefore,

1. The primary object of the testatrix was to found an asylum for orphans, and the direction in favor of Episcopalian children is secondary, being merely one of preference and not of exclusion, and in nowise alters the legal status of the institution. 2. The

fact that the orphans are, as part of their general education, to be instructed in the Christian religion as taught by the Episcopal Church, in nowise detracts from the public charitable nature of the institution. And, apart from the foregoing: 3. The appellant is a "purely public charity" within the constitutional provision, being an institution certain and definite in its objects, and uncertain and indefinite as to those constituting the class to be benefited thereby, being open to the indefinite public of the specified class, and being neither founded, endowed, nor maintained for private or corporate profit. 4. The appellant is directly within the legislative interpretation of the constitutional provision, being "an institution of learning founded, endowed or maintained by public or private charity;" and this express legislation is, and has been declared to be constitutional.

*Henry C. Howard* and *A. Lewis Smith,* for defendant in error.—
To restrict the power of the legislature to exempt property was plainly the intent of the convention which gave us the present constitution. The abuse of the privilege of exemption had become so flagrant as to demand a remedy. Institutions of charity to be entitled to exemption must be "purely public." This language was intended to have a strict construction. The charities authorized to be exempted are only those which are completely and entirely public. Does this asylum come within this definition of the term?

It is open to a certain class of children, to wit: "White female orphan children of legitimate birth, of the age of not less than four years, and of not more than eight years." Had the classification stopped here, the institution would undoubtedly be purely public. Then if two children of the prescribed color, sex, birth and age were applicants, they could, so far as classification is concerned, stand on a common footing, and if both could not be admitted for want of room, there would be nothing in the charter of the charity to prefer one over the other; and if the trustees unjustly or wrongfully preferred one over the other, a court of equity could remedy the evil. But it is not so. The donor saw fit to impose a further and a sectarian classification, which it is submitted cannot be recognised by the laws of this state.

We hold then that a charity founded on a religious belief, and from the benefits of which the general public are not only excluded, but from which all the orphans of the state are practically excluded, except those born or baptised in a particular faith, is not purely public.

The argument of the plaintiffs in error (that all charities are restricted from necessity) has no application, nor is it of any force to argue that blind asylums are for the blind alone, &c. These are restrictions made for the proper development of the benevo-

9 NORRIS—3

lence, and for its good government. They are as inherent in the proper working of charities as the division of labor is in the progress of society at large, found after long experience to be the best means of dispensing to the *entire community* the beneficent results of charitable action. There is no taint of partiality or exclusiveness about them. They are *not* classified by reason of incidental qualities or preferences foreign to the infirmities themselves, but because of these very infirmities.

Mr. Justice GREEN delivered the opinion of the court, June 7th 1880.

The Burd Orphan Asylum is an institution of learning, benevolence and charity, founded, endowed and maintained by private charity. It is directly within the letter of the Act of 14th May 1874, and is therefore prima facie exempt from taxation. In Donohugh's Appeal, 5 Norris 306, that act was held to be constitutional. This court has frequently ruled that the whole power of taxation is one of the exclusive functions of the legislative department of the government. The legislature has said that this class of property shall not be taxed, and that declaration must prevail, unless it is an unlawful exercise of legislative power. It can only have that character by being a clear violation of some definite provision of the constitution. We have decided that this act is not subject to that objection, and that decision is not questioned. But it is claimed that to extend the protection of the act to this particular property would be doing violence to article ix. of the constitution, which authorizes the legislature to exempt from taxation certain public property, places of religious worship "and institutions of purely public charity." In cases of doubt the legal presumption is in favor of the constitutionality of legislative enactments, and if this were a doubtful case, this principle would require us to give the act the benefit of the doubt when applied to property expressly exempted by its terms.

It is conceded that the devise in question has created a charity which is public in the strict sense of that expression. But it is urged, that it is not *purely* public, and hence that to apply the language of the act to this particular case, would be a violation of the constitutional provision. Now it must be conceded and it has been decided, here and elsewhere, that the word "purely" is not to have its largest and broadest significance when used in this connection. In the opposing line of thought it is admitted that the word is to have a limited meaning. It is not contended that a charity to be purely public must be open to the whole public, nor to any considerable portion of the public. Without doubt an asylum for the support of fifty blind men or an equal number of paupers would not be obnoxious to the objection that it was not "purely public." A charity for the maintenance of disabled seamen, or of aged and infirm stone masons, resident in the city of Philadelphia, would

[Burd Orphan Asylum v. School District.]

undoubtedly be a purely public charity. And so also would a charity for the education and maintenance of the children of such persons. And if such a charity should be limited to the white female orphan children of such persons between the ages of four and eight years, such limitations, though they would very greatly restrict the class and the number of the beneficiaries, would constitute no valid objection to the purely public character of the charity. But seamen and stone masons are only designated classes of persons distinguished by their occupations. A charity for the support of poor widows, or indigent old men, or the insane poor, of a city, county, borough or township would be equally a purely public charity, no matter how small would be the number of the beneficiaries or how limited the class.

Why, then, would not a charity for the support of poor Episcopalians, Catholics, Jews or Presbyterians of a state or city, be purely public; or a charity for the education and maintenance of the orphan children of such persons? No private gain or profit is subserved; the objects of such a charity are certain and definite, and the persons benefited are indefinite within the specified class. The circumstance that the beneficiaries are to be of a particular religious faith is only of importance as designating the class. It indicates a certain portion of the whole community who are to be recipients of the charity. It has the same effect in this respect as the words seamen, stone masons, blind persons, poor widows, &c., in the cases already mentioned. For the purpose of defining the class of persons, who, as distinguished from all other persons in the community, are to enjoy the benefit of the donor's bounty, the legal effect is the same, whether the words used be seamen, Episcopalians, blind persons, Catholics, poor widows, Jews, stone masons or Presbyterians. The argument that to sustain, as purely public, a charity in favor of persons of a particular religious faith, would be to maintain sectarianism, is of no weight. It is not discrimination in favor of a sect, for it is treating all sects alike. It is not even extending a preference to sectarians; it is merely recognising them as a class of persons. We see no reason why that community which ranges persons into classes, so far as this subject is concerned, may not be a community of religious faith, as well as of occupation, condition in life, sex, color, age, disability, physical or mental, or nationality. As to the meaning of the word "purely," when used in this connection, we concur in the construction which was given by the Supreme Court of Ohio in the case of Gerke v. Purcell, 25 Ohio St. Rep. 229, that, "when the charity is public, the exclusion of all idea of private gain or profit is equivalent in effect to the force of 'purely,' as applied to public charity in the constitution."

But there is another and a broader ground upon which this particular charity must be sustained as purely public. It is this: the

[Burd Orphan Asylum *v*. School District.]

third class of persons enumerated in the will of the testatrix as the objects of her bounty are, "all other white female orphan children of legitimate birth, not less than four years of age, and of not more than eight years, without respect to any other description or quali-fication whatever, except that at all times and in every case the orphan children of clergymen of the Protestant Episcopal ·Church shall have the preference." It will of course not be disputed that if this were the only class of beneficiaries mentioned in the will, the charity would be purely public in the strictest sense.

Does the circumstance that two other classes are first named take away that character, and if so, how? The learned judge of the court below stated and answered this question by saying that "the exclusion of the general public is so great as to amount to almost absolute rejection." This position makes the *legal* character of the charity to depend upon a question of fact. The argument *assumes*, for the purpose of testing the quality of the charity as being "purely public," that the orphan children of the general public can-not be admitted (because they are in point of fact excluded by the numbers of the persons to be admitted) in the first and second classes. Now in legal contemplation the persons of the third class are beneficiaries upon the same title, and with the same abstract rights as those of the first and second. In any case of application for admission by one of the third class, it would be no answer to say that there were other orphan children in the city or state who were of the Episcopal baptism, and had the other qualifications, and therefore the applicant could not be admitted. If there were actual vacancies in the asylum for more pupils, and no applications from persons of the first or second class, undoubtedly the applicant would be entitled to admission. And further, when once admitted such pupils would not be liable to be ejected in order to make room for subsequent applicants of the first or second class.

In other words, in such a case the only adequate reply that could be made to an applicant of the third class would be, that *at the time of the application* the asylum was already full. But that reply would be good in any case of a purely public charity. Hence, the only barrier to admission would be one that is common to all the classes and peculiar to none. How then can it be said that it is not a purely public charity because it is not open to the general public? In law it *is* open to them, and hence, by a court defining its legal meaning, it must be held to be purely public. .

But it is said that the children of the general public will be in point of fact excluded, because the preferred classes will always exhaust the physical capacity of the charity. How do we know this, or what right have we to assume it? We certainly cannot assume it as a matter of law, for it is a pure matter of fact; and we cannot adopt it as a fact, because there is no evidence in support of it on this record. This cause comes before us on a case stated, and

[Burd Orphan Asylum *v.* School District.]

we are confined to the facts there set forth. Nothing of this kind is there alleged, and we have no right to infer it. The only assertion in the case stated that relates to this subject implies the very reverse of this allegation, because it states that "children have been received without regard as to their residence as to either state or county."

If it were proper to dispose of the question by considering the probabilities as to the facts, we think they favor the theory that the children of the third class would have free admission to the asylum. The limitations are so sweeping and numerous that they reduce the preferred beneficiaries to an extremely small class. They must be of Episcopal baptism, which, at once, makes an immense reduction in the possible applicants. Further, they are to be white *females* and *orphans*, and between the ages of *four and eight years*. Each one of these qualifications diminishes enormously the number of those who are preferred. There are probably many Episcopal congregations in which there is not a single child coming within all these limitations. Moreover, there are other extensive limitations, not fixed by the will, but which would be practically operative. All female orphan children who have means or friends to provide for them, would as a general rule abstain from entering a charity school, especially one from which they are to be placed out at some employment. Outside of Philadelphia and a few neighboring counties this charity would be but little known, and this want of knowledge would increase with increasing distance. It must be considered, therefore, that orphan children whose nearest relatives are ignorant of the charity, and those who are unwilling to receive its benefits should be excluded from the computation. We can hence readily see how extremely small in number must be the preferred classes of beneficiaries likely to seek admission to this charity. We are not informed as to how many children can be accommodated, but it is not less than sixty, as that number are now provided for. The case stated, says: "A large amount of property" was given by the testatrix to establish the asylum, and that a tract of forty-five acres was purchased upon which the buildings were erected. If there is money enough there is certainly ground enough upon which to maintain a much larger number than sixty. In any event it is apparent that we are not at liberty to conclude, either as matter of fact or law, that the capacity of this charity is or will be exhausted by the reception of such applicants of the first and second classes as may desire to avail themselves of its benefits. As to the exception in favor of the children of Protestant Episcopal clergymen, all who would be at all likely to seek admission, are already included in the first and second classes. As to those living out of the state, we are not informed whether any such have ever sought admission, but the probable number would be so very small as not to affect the result. We are of

[Burd Orphan Asylum *v.* School District.]

opinion that the appellant is a purely public charity within the constitutional provision, and is within the letter of the Act of 14th May 1874, and therefore exempt from taxation.

Judgment reversed, and judgment is entered here in favor of the defendant on the case stated with costs.

Justices GORDON, TRUNKEY and STERRETT, dissented.